UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ALLTEL COMMUNICATIONS, LLC, | ) | CIV. 10-5011-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DISMISSING |
| vs. | ) | COUNTERCLAIM |
| | ) | |
| OGLALA SIOUX TRIBE, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

On May 7, 2010, Defendant Oglala Sioux Tribe ("Tribe") filed a counterclaim. (Docket 75, pp. 12-20). On June 1, 2010, plaintiff Alltel Communications, LLC, filed a motion to dismiss the counterclaim pursuant to Fed. R. Civ. P. 12(b)(6). (Docket 90). The Tribe did not file a response in resistance to the motion to dismiss and in support of its counterclaim.[1] The matter is now ripe for resolution by the court. For the reasons stated below, the motion to dismiss the counterclaim is granted.

## DECISION

By its counterclaim, the Tribe claims that it, and it alone, is the owner of the electromagnetic spectrum (also referred to as the "radio spectrum") which exists over the Pine Ridge Indian Reservation. (Docket 75, pp. 12-20). The Tribe seeks both declaratory and injunctive relief, asking the court to

---

[1]The Tribe filed an affidavit of Jonathan E. Canis (Docket 95), its FCC attorney, which will be discussed later in this order.

prohibit plaintiff from selling or assigning any licensing of this spectrum by the Federal Communications Commission ("FCC") to any other party.[2]  Id. at pp. 18-19.

     Rule 12(b)(6) provides for the dismissal of a counterclaim if the counter-claimant[3] has failed to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In evaluating Alltel's Rule 12(b)(6) motion, the court accepts as true all of the factual allegations contained in the Tribe's counterclaim and grants all reasonable inferences in favor of the Tribe as the nonmoving party.  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ") (citing Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009).  See also Crooks v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009) (the court must review "a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the facts alleged in the [counterclaim] as true and granting all reasonable inferences in favor of [the Tribe], the nonmoving party.").

---

[2]The Tribe did not join either the United States or the FCC as counterclaim defendants.  They are indispensable parties under Fed. R. Civ. P. 19(a)(1)(B)(i).

[3]For ease of readability the parties will be identified using their name or status as provided in the caption.

"[O]nly a [counterclaim] that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950. A court is "not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 555 (2007).[4] "In assessing a motion under Rule 12(b)(6), a court should . . . not dismiss [a counterclaim] 'unless it appears beyond doubt that the [Tribe] can prove no set of facts in support of [its] claim which would entitle [it] to relief.' " Holloway v. Lockhart, 792 F.2d 760, 761 (8th Cir. 1986) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). For evaluation of this Rule 12(b)(6) motion, the following factual statements taken from the Tribe's counterclaim are deemed true.

The Oglala Sioux Tribe is the democratically-elected government of the Oglala Sioux people, with a governing body duly recognized by the Secretary of Interior. (Docket 75, pp. 12-13, ¶ 1). The Tribe enjoys all of the rights and privileges guaranteed under its existing treaties with the United States in accordance with 25 U.S.C. § 478b. Id. at p. 13, ¶ 2. The Tribe is a party to the Ft. Laramie Treaty of April 29, 1868, 15 Stat. 635 (the "1868 Treaty"). Id. at ¶ 3. Under Article 2 of the 1868 Treaty the United States recognized a

---

[4]Since Twomby and Iqbal are the most significant precedents on this issue, any internal quotations or citations to earlier cases are being omitted throughout the remainder of this decision.

territory, which includes the present-day Pine Ridge Indian Reservation, for the Tribe's "absolute and undisturbed use and occupation." Id.

Both the United States and the Tribe are legally bound by the Act of March 2, 1889, ch. 405, 25 Stat. 888 (the "1889 Act"). Id. at p. 15, ¶ 9. Under Section 16 of the 1889 Act, the "exclusive use and occupation" language in Article 2 of the 1868 Treaty was made applicable to the Tribe and the Pine Ridge Indian Reservation. Id. at ¶ 10. Section 16 further provided "the acceptance of this act by the Indians . . . shall be taken and held . . . to confirm in the Indians . . . to their separate and exclusive use and benefit, all the title and interest of every name and nature secured therein" to the Tribe by the 1868 Treaty. Id. at p. 16 (emphasis added in counterclaim).

As indicated above, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. The Tribe asserts a series of legal conclusions throughout the remainder of its counterclaim. The following allegations prove that point.

Based on the "absolute use and occupation" language of the 1868 Treaty and the 1889 Act, the Tribe alleges it owns "all frequencies of radio spectrum within the Pine Ridge Indian Reservation, including the broadband frequencies allocations purportedly allocated and/or auctioned off by the FCC to . . . Alltel . . . or any other user, buyer or seller of radio

4

spectrum frequencies." (Docket 75, p. 16, ¶ 11). The Tribe alleges this radio spectrum is vested property belonging to the Tribe under the 1868 Treaty, the 1889 Act and the Fifth Amendment. Id. at ¶ 12. The Tribe alleges the radio spectrum is held in trust for the Tribe by the United States. Id. The Tribe asserts it has never ceded ownership of the radio spectrum within the Pine Ridge Indian Reservation to the United States and the United States never accepted a cession of such radio spectrum from the Tribe. Id. at p. 17, ¶ 14. Further, the Tribe alleges the Bureau of Indian Affairs never approved any conveyance of the radio spectrum to any third party. Id. at ¶ 15.

The Tribe alleges the FCC, as an independent agency of the United States, is a trustee of the Tribe. Id. at pp. 16-17, ¶ 13. In this trust capacity, the Tribe claims the FCC cannot allocate, sell or auction off the Tribe's radio spectrum to any third party without complying with the 1868 Treaty. Id. at p. 17, ¶ 14. Thus, the Tribe alleges that it has suffered, or will suffer, injury if its interests in the radio spectrum are not protected by declaratory and injunctive relief from the court. Id. at p. 18, ¶ 17; see also the counterclaim's prayer for relief, ¶ 4 at pp. 18-19.

Before addressing the Tribe's counterclaim, it is necessary to understand the nature of the electromagnetic spectrum or radio spectrum.

> Perhaps the most familiar part of the electromagnetic spectrum is
> the Visible Light Spectrum. The light with which you are reading

>this page is, in reality, radiation covering part of the electromagnetic spectrum. . . . The electromagnetic spectrum extends in both directions from the visible [light] range. Shorter-wavelength, higher frequency "light" includes ultraviolet, x-rays, and cosmic rays. Longer-wavelength, lower-frequency "light" includes first infrared light then, as wavelengths become longer and longer, radio waves.

National Telecommunications and Information Administration, *Basic Elements of Spectrum Management*: *The Spectrum Defined*.[5]  That government site further explains:

>Electromagnetic waves propagate outward in all directions. . . . The electromagnetic spectrum exhibits some of the properties of what economists call a *Common Good*.  Other than the cost of designing, building, and operating radio stations, its use is free . . . . The electromagnetic spectrum is an unusual common good, or natural resource because, unlike iron, oil, or coal, it is not destroyed by use. When one user stops using a portion of the spectrum, another can readily use it.  The spectrum is scarce, though, because at any given time and place one use of a portion of the spectrum precludes any other use of that portion.

Id. at *Regulating the Use of the Spectrum*.[6]

By its nature, the electromagnetic spectrum belongs to no one.  In re NextWave Personal Communications, Inc., 200 F.3d 43, 50 (2d Cir. 1999). "It is not property that the federal government can buy or sell.  It is no more government-owned than is the air . . . ." Id.  Its use must be regulated to avoid chaos.  Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 375

---

[5] www.ntia.doc.gov/osmhome/roosa1.html

[6] www.ntia.doc.gov/osmhome/roosa3.html

(1969). But is the electromagnetic spectrum "an unusual common good, or natural resource" subject to the treaty claims of an Indian tribe?

"Treaties are not a grant of property or sovereignty to Indian tribes, but a cession of those rights to the United States with a reservation of those rights not abandoned."[7] Cohen's Handbook of Federal Indian Law § 5.01[2] at p. 394 (5th ed. 2005). The Indian commerce clause of the United States Constitution, Article 1, § 8, authorized Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Id. at § 5.01[3] at p. 395.

"Original Indian title, also known as aboriginal Indian title, refers to land claimed by a tribe by virtue of its possession and exercise of sovereignty rather than by virtue of letters of patent or any formal conveyance." Id. at § 15.04[2] at p. 969. But, "a tribe must establish its 'actual, exclusive, and continuous use and occupancy "for a long time" prior to the loss of the property.' " Id. at p. 970 (citing Sac & Fox Tribe of Oklahoma v. United States, 383 F.2d 991, 997-98 (Ct. Cl. 1967). The term "recognized title" "refers to tribal property that has been formally acknowledged by Congress through treaty or statute." Id. at 974. The

---

[7]Cohen makes this statement by reference to United States v. Winans, 198 U.S. 371, 381 (1905) ("In other words, the treaty was not a grant of rights to the Indians, but a grant of right from them,-a reservation of those not granted.").

terms "use and occupation" or "absolute and undisturbed use and occupation" "purport[] to recognize Indian title or permanent rights to particularly described land, [and] it creates recognized Indian title." Id. at § 15.04[3] at p. 977. These phrases, "use and occupation" or "absolute and undisturbed use and occupation," "are interpreted as vesting recognized and enforceable property rights in the tribes." Id.

"The general rule is that ambiguities in treaties should be resolved in favor of the Indians." Yankton Sioux Tribe v. United States, 623 F.2d 159, 166 (Ct. Cl. 1980).

> (T)hese treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, . . . and any doubtful expressions in them should be resolved in the Indians' favor.

Id. (citing Choctaw Nation v. Oklahoma, 397 U.S. 620, 630-31 (1970) (internal citations omitted).

The question is whether the radio spectrum is part of the land in which the Tribe retained "absolute and undisturbed use and occupation." To analyze that question, the court recognizes that neither the government nor the Tribe contemplated the existence of the radio spectrum at the time of the 1868 Treaty. By analogy, however, the ownership of air or light above the land would be a comparable claim.

> It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe-Cujus est solum ejus est usque ad coelum.[8] But that doctrine has no place in the modern world. The air is a public highway, as Congress has declared.[9] Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim.

United States v. Causby, 328 U.S. 256, 260-61 (1946).

The Supreme Court further declared:

> We have said that the airspace is a public highway. Yet it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. . . . While the owner does not in any physical manner occupy that stratum of airspace or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light and air is used. . . . The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are.

Id. at 264-66.

---

[8]Latin for "for whoever owns the soil, it is theirs up to Heaven and down to Hell." Causby, 328 U.S. at 261, n. 5 (citing 1 Coke, Institutes, 19th Ed. 1832, ch. 1, s 1(4a); 2 Blackstone, Commentaries, Lewis Ed. 1902, p. 18; 3 Kent, Commentaries, Gould Ed. 1896, p. 621).

[9]"[T]he Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. § 171 *et seq.*, 49 U.S.C.A. § 171 *et seq.*, as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. § 401 *et seq.*, 49 U.S.C.A. § 401 *et seq.* Under those statutes the United States has 'complete and exclusive national sovereignty in the air space' over this country. 49 U.S.C. § 176(a), 49 U.S.C.A. §176(a)." Causby, 328 U.S. at 260.

Against this historical backdrop it is clear that a tribe, a state, or the United States cannot own either the light or the air above the land. "The United States does not 'own' the airspace above its territorial boundaries, although it undoubtedly has considerable authority to regulate the use of that airspace." Massachusetts v. United States, 435 U.S. 444, 473 (1978). "It is beyond dispute that Congress's power over interstate commerce includes the power to regulate use of the nation's navigable airspace, which is a channel of interstate commerce." Ickes v. FAA, 299 F.3d 260, 263 (3d Cir. 2002). See also 49 U.S.C. § 40103(a)(1) (2000) ("The United States Government has exclusive sovereignty of airspace of the United States."). "Not only is it well recognized that the Indian tribes possess attributes of sovereignty in many respects comparable to those of the states, United States v. Mazurie, 419 U.S. 544 (1975), but Congress has recognized that clean air, wherever located, is in the public interest." Nance v. E.P.A., 645 F.2d 701, 716 (9th Cir. 1981), *cert. denied by* Crow Tribe of Indians Montana v. E.P.A., 454 U.S. 1081 (1981).

"[I]t is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 116 (1960). See also Solis v. Matheson, 563 F.3d 425, 430 (9th Cir.

10

2009) ("Indians and their tribes are equally subject to statutes of general applicability, just as any other United States citizen.").

The "Federal Radio Commission [predecessor of the FCC] was established to allocate frequencies among competing applicants in a manner responsive to the public convenience, interest, or necessity." Red Lion Broadcasting, 395 U.S. at 376-77 (internal quotation marks omitted). "Congress assigned to the Federal Communications Commission . . . exclusive authority to grant licenses [under the FCA]." Metro Broad., Inc. v. FCC, 497 U.S. 547, 553 (1990), *overruled on other grounds by* Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995). The Federal Communications Act ("FCA"), 47 U.S.C. § 151 *et seq.*, established the nationwide system for the regulation of the electromagnetic spectrum for radio transmissions. Congress delegated the authority, solely and exclusively, to the FCC to license the *use* of radio transmissions. 47 U.S.C. § 301.

"It is a 'venerable principle' that an agency's long-standing interpretation of a statute it is charged with implementing is entitled to great weight. See, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381 (1969) . . . . This principle is particularly compelling when the agency interpretation is reinforced by subsequent congressional legislation . . . Red Lion Broadcasting Co., 395 U.S. 367, 381-82 (1969)." Yankton Sioux Tribe,

623 F.2d at 166 (citing Duncan v. United States, 597 F.2d 1337, 1342 (Ct. Cl. 1979), *vacated and remanded on other grounds*, ___ U.S. ___, 100 S. Ct. 1827.

In denying a tribe the authority to independently regulate radio spectrum, the FCC concluded:

> Under well-established case law construing Indian treaties and tribal self-government, it is clear that when Congress passes a law which is applicable nationwide, the law applies with equal force to Native Americans on reservations, subject to three well defined exceptions--Native Americans have the exclusive right to self-governance 1) over intramural matters; 2) where rights are guaranteed to them by treaty; and 3) if Congress expressly states that a law does not apply to them.  None of these exceptions are applicable to radio frequency management, and more particularly the Commission's cellular licensing scheme.

In the matter of AB Fillins, 12 F.C.C.R. 11755, 11765 (1997) (emphasis added).  The FCC contemplated providing independent tribal authority over the radio spectrum and the difficulties that would pose.

> To allow Native Americans to exercise independent spectrum management authority and exempt them from the national cellular licensing scheme would clearly thwart the legislative intent underlying the Communications Act and the policies served by our cellular licensing rules. It is not in the public interest for [the tribal utility authority] to carve an additional market out of the [service area] made up of the lands encompassing the Sells Reservation.

Id. at 11766.  But in reaching this conclusion, the FCC acknowledged that "[a]lthough under existing law the [Tribe] maintains authority to control the occupation and use of tribal lands, and therefore can deny cell sites to the

Commission's licensee, it does not have the additional power to displace the Commission's licensing process." Id.

"[B]roadcast frequencies constitute[ ] a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard." Red Lion Broadcasting, 395 U.S. at 376. "The scarcity of radio frequencies therefore required a regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to specific users." NextWave Personal Communications, 200 F.3d at 50.

In the final analysis, Congressional control of the electromagnetic spectrum does not cause a "direct and immediate interference with the enjoyment and use of the land." Causby, 328 U.S. at 266. There is no ambiguity in the 1868 Treaty on this subject. The electromagnetic spectrum, like the air, is owned by no one. Id. at 261. Granting the FCC exclusive licensing authority over the electromagnetic spectrum does not conflict with the Tribe's "absolute and undisturbed use and occupation" of the Pine Ridge Indian Reservation under Article 2 of the 1868 Treaty.

The Tribe is free to access radio frequency without asserting treaty ownership of electromagnetic spectrum. Indeed, it has done so. (Docket 95). The Tribe's submissions to the FCC are in direct conflict with the Tribe's position in its counterclaim. In its FCC submissions, the Tribe made no treaty rights claim, but rather "[o]wnership of the spectrum . . . would

pass to the Tribe . . ." by the licensing process. (Docket 95-3, p. 11). <u>See also</u> the Tribe's "Redlined Changes to AT&T Term Sheet." (Docket 95-5, p. 2) ("At the closing of the transaction contemplated by this Term Sheet . . . AT&T will transfer to the [Tribe] . . . (ii) spectrum . . . subject to approval from the [FCC] . . . ."); the Tribe's "Consolidated Proposal to AT&T." (Docket 95-6, p. 2) ("AT&T agrees to transfer the following property on the reservation to the Tribe . . . 850 Mhz Spectrum used by existing . . . network. . . .").

The court concludes there is "no set of facts" which would entitle the Tribe to the relief it seeks. <u>Holloway</u>, 792 F.2d at 761. The plaintiff's Rule 12(b)(6) motion to dismiss the defendant's counterclaim is granted.

## ORDER

Based on the court's decision, it is hereby

ORDERED that plaintiff's motion to dismiss (Docket 90) is granted.

IT IS FURTHER ORDERED that the defendant's counterclaim (Docket 75, pp. 12-20) is dismissed on its merits, with prejudice.

Dated February 28, 2011.

        BY THE COURT:

        /s/ *Jeffrey L. Viken*
        JEFFREY L. VIKEN
        UNITED STATES DISTRICT JUDGE